## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## BAY CITY DIVISION

| | |
|---|---|
| Bridget D. Charles, <br><br> Plaintiff, <br><br> v. <br><br> Northland Area Federal Credit Union, <br><br> Defendant. | CASE NO. 1:25-cv-12749 <br><br> **COMPLAINT AND DEMAND FOR JURY TRIAL** <br><br> 1. Violation of Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* |

COMES NOW Plaintiff **BRIDGET D. CHARLES** ("Plaintiff"), an individual, based on information and belief, to allege as follows:

### INTRODUCTION

1. This case arises under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681s-2(b). Plaintiff seeks redress for the unlawful and deceptive practices committed by the Defendant in connection with their inaccurate, misleading, or incomplete reporting of Plaintiff's debt reaffirmed in her Chapter 7 bankruptcy.

2. Defendant Northland Area Federal Credit Union ("Northland") is inaccurately reporting Plaintiff's account discharged through bankruptcy to TransUnion, LLC ("TransUnion").

3. The United States Congress has found the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system and unfair credit reporting methods undermine the public confidence that is essential to the continued functioning of the banking system.

4. A pervasive and fundamental misunderstanding presently thrives in the United States regarding the long-term impact that filing a consumer bankruptcy has on the consumer's creditworthiness. Specifically, consumers tend to believe that since a bankruptcy can be reported on their credit report for ten (10) years, their creditworthiness will be ruined for the same length of time. This is not true.

5. The *majority* of consumer debtors file a consumer bankruptcy to *raise* their FICO Score and remedy their poor creditworthiness.

6.     In fact, it is possible for consumer debtors to obtain a 700 FICO Score as soon as twelve (12) months from filing a consumer bankruptcy (Chapter 7 or Chapter 13).

7.     Creditors and lending institutions are aware of the misconception that filing a consumer bankruptcy destroys the consumer's creditworthiness of ten (10) years; however, to perpetrate this bankruptcy myth, creditors intentionally and routinely ignore industry standards for accurately reporting bankruptcies, as well as the debts included in those bankruptcies, to keep consumers' credit scores low and their interest rates high.

8.     Creditors know that deviating from recognized credit reporting standards will make it difficult for consumers to raise their credit scores and improve their creditworthiness.

9.     This was not the intent of Congress when it enacted the Fair Credit Reporting Act and the Bankruptcy Abuse Prevention and Consumer Protection Act.

## JURISDICTION & VENUE

10.     Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

11.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, 1367, and 15 U.S.C. § 1681.

12.     This venue is proper pursuant to 28 U.S.C. § 1391(b)(1).

13.     Plaintiff alleges that, for purposes of establishing residency under 28 U.S.C. § 1391(b)(1), the named Defendant conducts sufficient business within the forum state and this Court has personal jurisdiction over Defendant under 28 U.S.C. §§ 1391(c)(2) and 1391(d).

## GENERAL ALLEGATIONS

14.     Plaintiff alleges that the Northland account covers a motor vehicle that was reaffirmed in her bankruptcy. Plaintiff alleges she was current on her vehicle payments at the time of filing her bankruptcy and continued to make payments after filing bankruptcy. Subsequent to the reaffirmation, Plaintiff made all payments and has continued to do so until present.

15.     Plaintiff alleges that Northland is incorrectly reporting Plaintiff's account as discharged in bankruptcy to TransUnion.

16.     Further, Northland is incompletely and inaccurately reporting payment history even though Plaintiff made all payments since the reaffirmation and has continued to do so until present.

17.     Plaintiff alleges the Northland tradeline on her TransUnion report fails to list the debt as reaffirmed.

18.    Plaintiff alleges it is patently incorrect to report a reaffirmed debt as discharged in bankruptcy.

19.    Plaintiff alleges it is patently incorrect to report a reaffirmed debt as closed.

20.    Plaintiff alleges it is patently incorrect to suppress payment history or report "no data" in the payment history in a month where payment was timely tendered and accepted.

21.    Plaintiff alleges that "no data" reported in the payment history portion of a tradeline is acceptable reporting only when accurate payment history is not known during that particular month or when payments are not required during that particular month due to deferment, grace period, or forbearance.

22.    Plaintiff alleges that the FCRA requires complete and accurate reporting; therefore, if an account is reported, it should report all portions of that account in a manner which complies with the maximum accuracy and completeness standard of the FCRA.

23.    Plaintiff alleges that Defendant is familiar with the FCRA requirements and credit reporting industry standards and subscribes thereto.

24.    Plaintiff alleges that Defendant understands that deviation from the FCRA requirements or credit reporting industry standards can, and often does, result in the denial of credit, higher interest rates, and prompts a negative inference that would not be drawn if the data were reported in accordance with the recognized standards.

25.    Plaintiff alleges that all of Defendant's actions alleged herein were committed knowingly, intentionally, and in reckless disregard of the unambiguous meaning of the FCRA, regulatory guidelines on accurate reporting, and credit reporting industry standards to purposefully undermine her ability to repair her Credit Score.

26.    In the alternative, Plaintiff alleges that Defendant's actions were the result of negligent policies, procedures, and an objectively unreasonable interpretation of the FCRA, all which inevitably led to inaccurate, misleading, or incomplete credit reporting.

### FACTUAL BACKGROUND

27.    Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.    FICO, Inc.**

28.    FICO is a leading analytics software company with its principal headquarters in San Jose, California. FICO has over 130 patents related to their analytics and decision management

technology and regularly uses mathematical algorithms to predict consumer behavior, including credit risk.

29.     The FICO Score has become the standard measure of consumer credit risk in the United States and is used in ninety percent (90%) of lending decisions.[1]

30.     A FICO Score consists of a three-digit number summarizing a consumer's credit risk or likelihood to repay a loan. FICO periodically updates its scoring models resulting in multiple FICO Score versions.

31.     Base FICO Scores range from 300 to 850, while industry specific FICO Scores range from 250-900. A higher FICO Score demonstrates lower credit risk or less likelihood of default.

32.     Different lenders use different versions of FICO Scores when evaluating a consumer's creditworthiness.

33.     There are twenty-eight (28) FICO Scores that are commonly used by lenders.

34.     A consumer's FICO Score is calculated based solely on information in consumer credit reports maintained at credit reporting agencies ("CRAs").

35.     The three largest CRAs are Experian Information Solutions, Inc. ("Experian"); Equifax Information Services, LLC ("Equifax"); and TransUnion, LLC ("TransUnion").

36.     FICO does not control what information is provided on a consumer's credit report. Instead, the scoring models, or algorithms, are based on the premise that the information provided by the CRAs is accurate and complies with both the FCRA requirements and credit reporting industry standards.

37.     There are five (5) key factors that a FICO Score considers: (1) payment history; (2) amount of debt; (3) length of credit history; (4) new credit; and (5) credit mix.

38.     Each of the five (5) factors is weighted differently by FICO.

39.     In other words, thirty-five percent (35%) of a consumer's FICO Score relates to payment history, thirty percent (30%) relates to the amount of debt, fifteen percent (15%) relates to the length of credit history, ten percent (10%) relates to new credit, and the final ten percent (10%) relates to a consumer's credit mix, which is the different types of debts reported.

---

[1] While there are other credit scoring models, it is well established that FICO Score is by far the most widely used by lenders, employers, insurance companies, and lessors. *See* https://www.myfico.com (a website created and operated by Fair Isaac Corporation ("FICO"), "the company that invented the FICO credit score").

40.     Payment history refers to whether a consumer has paid their bills in the past, on time, late, or missed payments. The more severe, recent, or frequent the late payment information, the greater the impact on a FICO Score. Public record items, such as bankruptcy, foreclosure, judgments, and wage garnishments are also considered part of a consumer's payment history.

41.     In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently this occurred, and how many delinquent accounts exist.

42.     Once a delinquent account has been remedied, the longer the account stays current the more a consumer's FICO Score should increase.

43.     FICO Scores are entirely dependent upon information provided by data furnishers ("DFs"), such as banks and other financial institutions, to CRAs.

44.     The FICO scoring formula treats both Chapter 7 and Chapter 13 Bankruptcies similarly in terms of their impact on one's FICO Score. Specifically, both Chapters have the same level of severity with respect to their FICO Score and FICO uses the filing date, under both Chapters, to determine how long ago the bankruptcy took place.

45.     A FICO Score is a summary of your credit report. In simple terms, the FICO Score is calculated by taking the five (5) factors (payment history, amount of debt, length of credit history, new credit, and credit mix) for each account in a credit report and calculating a three-digit number for lenders to review. "When you apply for credit, lenders need a fast and consistent way to decide whether or not to loan you money." *See* https://www.myfico.com/credit-education/what-is-a-fico-score. If a lender or employer did look past the FICO Score into a consumer's reports, chances are they either do not understand the tradeline meanings themselves, or, if they do and realize something appears incorrect, they are incapable of recalculating the complex mathematical algorithms in a FICO Score to take the found error into consideration. Therefore, most lenders and employers do not review individual accounts, just a consumer's FICO Score (or average of FICO Scores) in order to make "quicker decisions". *See id.*

46.     Some lenders also use internal scoring models. In these instances, the lenders attempt to produce their own "FICO Score" based upon their internal credit scorecard models. These models are, similar to FICO, based upon algorithms, business rules, codes, etc. and take information reported in the credit reports and assign weights to them in order to assess risk and make determinations as to consumer's creditworthiness. FICO Scores and the scores based off internal models being collectively referred to as "Credit Score".

**B.      e-OSCAR**

47.      e-OSCAR is the web-based system developed by Experian, Equifax, TransUnion, and Innovis that enables DFs and CRAs to create and respond to consumer credit disputes.

48.      When a consumer sends a dispute letter to a CRA, the CRA then sends an automated credit dispute verification ("ACDV") via e-OSCAR to the appropriate DF.

49.      The ACDV contains codes next to certain data fields associated with a credit file.

50.      When a data furnisher reports on a consumer's account as part of its regular reporting, it sends a regular monthly transmission to each CRA.

51.      When a data furnisher reports on a consumer's account outside of its regular monthly transmission, it sends an automated universal dataform ("AUD") to each CRA.

52.      For clarification, an AUD or other regular transmission is sent when the data furnisher initiates reporting on a consumer's account (e.g., opening an account, updating the account each month, closing an account, etc.), whereas an ACDV is how a data furnisher receives a dispute request from the CRAs and how it updates reporting back to the CRAs after its investigation of the matter.

**C.      Bankruptcy Credit Reporting Industry Standards & Consumer Information Indicator**

53.      When a consumer files bankruptcy, certain credit reporting industry standards exist.

54.      Certain data is regularly expected and calculated by FICO when determining a consumer's creditworthiness.

55.      The Consumer Information Indicator ("CII") is a critical field that indicates a special condition that applies to a specific consumer.

56.      It is the credit reporting industry standard to report a very specific CII upon the filing of a consumer bankruptcy.

57.      The CII "R" denotes reaffirmation of a debt. In addition, completely reaffirmed debts should report appropriate Account Status and account information as it applies going forward.

58.      The CII field is a critical field for consumers as it directly relates and impacts a consumer's creditworthiness.

59.      The lack of a CII reported makes it appear that a consumer has not addressed outstanding debt obligations through the bankruptcy process.

60.     Furthermore, the lack of a CII reported suggests that creditors are free to collect against a consumer as an individual, or that no stay exists to prevent in personam collection activity.

61.     Failure to report the correct CII indicator will prompt those making credit decisions to draw a more negative inference than if the appropriate CII indicator were reported.

62.     The FCRA permits a bankruptcy to be reported for ten (10) years from the date the bankruptcy was filed.

63.     A consumer's FICO Score is directly related to the date on which a petition is filed and acknowledged.

64.     The bankruptcy's impact on a consumer's FICO Score lessens with the passage of time.

65.     Accordingly, the failure to reference the bankruptcy filing (CII field) and/or the correct petition date results in a lower FICO Score, which in turn causes credit decision makers to draw a more negative inference regarding a consumer's creditworthiness.

**D.      Reaffirmation Agreements**

66.     A reaffirmation agreement is a legally binding agreement between a debtor and a creditor that reaffirms the debtor's obligation to pay a debt that would otherwise have been discharged in the bankruptcy.

67.     Pursuant to 11 U.S.C. § 524(c), an agreement is enforceable if: (1) it is made before the discharge is entered, (2) the debtor receives certain required disclosures at or before signing the agreement, (3) the agreement is filed with the court and, if applicable, includes a declaration by the debtor's attorney that the debtor was given certain advisements, (4) the debtor does not rescind the agreement, and (5) the agreement does not impose undue hardship upon the debtor.

68.     A commonly used reaffirmation agreement is Form B 240A.[2]

69.     Part V. of Form B 240A is titled, "Disclosure Statement and Instructions to Debtor(s)" which includes the following portion:

    6.     When will this reaffirmation agreement be effective?

        a. If you *were represented.*by an attorney during the negotiation of your reaffirmation agreement and

---

[2] This form template can be found on most bankruptcy court's websites.

i. if the creditor is not a Credit Union, your Reaffirmation Agreement becomes effective when it is filed with the court unless the reaffirmation is presumed to be an undue hardship. If the Reaffirmation Agreement is presumed to be an undue hardship, the court must review it and may set a hearing to determine whether you have rebutted the presumption of undue hardship.

70.     11 U.S.C. § 524(m)(1) states there is presumed undue hardship if the debtor's monthly income less monthly expenses is less than the scheduled payments for the reaffirmation agreement. The court must review this presumption. This presumption expires 60 days after the agreement is filed with the court.

**E.     Plaintiff's Debt was Reaffirmed in her Bankruptcy**

71.     Plaintiff filed a voluntary petition for Chapter 7 bankruptcy on May 16, 2024, in order to repair her creditworthiness and Credit Score.

72.     On or about June 24, 2024, Plaintiff executed a Reaffirmation Agreement, and it was filed with the court by Northland on June 27, 2024 ("Reaffirmation Agreement").

73.     All requirements were met in order to satisfy 11 U.S.C. § 524; therefore, the Reaffirmation Agreement was effective upon its filing with the Court.

74.     Plaintiff's bankruptcy was discharged on August 20, 2024.

75.     Northland had actual knowledge the account was reaffirmed and therefore excluded from discharge.

**F.     Plaintiff's Credit Report Contains an Inaccurate and Adverse Tradeline, which Plaintiff Disputed to no Avail**

76.     On August 22, 2024, Plaintiff ordered a TransUnion credit report to ensure proper reporting by her creditors (the "August 22 Credit Report").

77.     Plaintiff noticed an adverse tradeline in her August 22 Credit Report, reporting inaccurate, misleading, or incomplete information that did not comply with the FCRA standards.

78.     Plaintiff then disputed the inaccurate tradeline regarding the Northland account via certified mail to TransUnion on or about January 16, 2025 (the "First Dispute Letter") and again on or about July 31, 2025 (the "Second Dispute Letter").

79.     The First Dispute Letter and Second Dispute Letter referred herein collectively as the "Dispute Letters."

80.    Plaintiff's Dispute Letters specifically put Northland on notice that the account should not be listed as closed or discharged in bankruptcy since the account was reaffirmed.

81.    Plaintiff's Dispute Letters included a copy of the signed Reaffirmation Agreement along with a copy of Plaintiff's payment history from on the account to support Plaintiff's contention that the account was not closed or discharged and that she had been and continued to make payments.

82.    Plaintiff's Dispute Letters also detailed what was perceived to be problematic about the Northland account reporting, addressing the tradeline specifically.

83.    Plaintiff requested that any derogatory reporting be updated to ensure accuracy and completeness of the account as required by the FCRA.

84.    Plaintiff is informed and believes that TransUnion received Plaintiff's Dispute Letters and, in response, sent Plaintiff's disputes to Northland, as the data furnisher, via an ACDV through e-OSCAR.

85.    Plaintiff ordered another TransUnion credit report to determine if the reporting on the account was updated.

**a.  Inaccuracy – Northland**

86.    Despite actual knowledge, Northland continued to report Plaintiff's account, beginning in 14181427XXXX, to TransUnion as closed, with a CII of "E", a payment status of ">Account Included in Bankruptcy<", without a balance, without a monthly payment amount, a comment of "CHAPTER 7 BANKRUPTCY", and with incomplete and inaccurate payment history. This is patently incorrect as this account is open, was reaffirmed, payments were made, and it was not discharged in bankruptcy.

87.    Reporting a reaffirmed debt as discharged in bankruptcy is patently incorrect.

88.    Reporting no payment history or reporting "no data" when payments have been made is patently incorrect.

89.    Reporting an open and ongoing account as closed is patently incorrect.

90.    In addition, this inaccurate and incomplete tradeline is misleading in a way that can adversely affect credit decisions.

91.    Plaintiff alleges that Northland failed to investigate whether the account was reaffirmed, or whether the Plaintiff had been making payments since filing the Reaffirmation Agreement.

92.     TransUnion provided notice to Northland that Plaintiff was disputing the inaccurate and misleading information; however, Northland failed to conduct a reasonable investigation of the information as required by the FCRA.

93.     Based on Plaintiff's disputes, the provided Reaffirmation Agreement (which Northland signed and was filed with the court), along with the Plaintiff's payment history, Northland should have known that Plaintiff's account was not discharged due to the Reaffirmation Agreement and that Plaintiff has maintained a positive payment history which was not being properly reported.

94.     The most basic investigation would include a simple review of bankruptcy documents and other provided documentation on the account compared to its reporting in order to determine if it complies with the maximum possible accuracy and completeness standard of the FCRA.

95.     Plaintiff alleges that Northland failed to review if its reporting complied with the FCRA or industry standards for credit reporting, the dispute letter or documents received, or Plaintiff's publicly available bankruptcy documents.

96.     If Northland reviewed such standards and records, it would have seen that its reporting was not in compliance and was therefore inaccurate or incomplete. At the very least, the investigation would reveal that payments were made on the account, and therefore, those payments should be reported.

97.     Northland should have reported the CII Code as "R" and updated the account to accurately report all the payments made on the account.

98.     By continuing to report Plaintiff's account as described hereinabove, it incorrectly appears to third parties viewing Plaintiff's credit reports that Plaintiff has not properly made payments and that the account was discharged in her bankruptcy. This makes Northland's reporting misleading.

99.     Further, as this inaccurate reporting is being used to calculate Plaintiff's Credit Score, the credit score alone being what most lenders use to determine Plaintiff's creditworthiness, it is misleading in such a way as to adversely affect credit decisions.

100.     A discharged debt is treated far more derogatorily by a potential lender than one which was reaffirmed and reflects a consumer's ability to make payments month after month, year after year.

101.    As payment history makes up thirty-five percent (35%) of a consumer's credit score, and as most lenders approve or deny credit based on a consumer's credit score (as opposed to poring through each tradeline of every account listed to obtain context), the incorrect payment history reported by Northland is lowering Plaintiff's Credit Score, which adversely affects her ability to obtain credit.

102.    Further, even if a lender did look through the tradelines, based upon the reporting of Northland, it appears as if the Plaintiff has not made payments on the account and that it was discharged in bankruptcy; all of which is inaccurate.

103.    The lack of investigation and reporting of inaccurate and incomplete information by Northland is unreasonable.

**G.    Damages**

104.    Plaintiff pulled her credit reports at issue at a cost for access to the reports, after the dispute process, specifically for the sole purpose of verifying that the inaccuracies were fixed.

105.    As a result of the incorrect reporting, Plaintiff has incurred out-of-pocket expenses, and has also suffered emotional harm, physical sickness, and excessive stress resulting in doubt as to the effectiveness of the Fair Credit Reporting Act and the power of this Court to preserve and perpetuate Plaintiff's rights to accurate credit reporting as intended by Congress.

106.    Plaintiff has been denied credit and is unable to rebuild her credit based on the inaccurate reporting by Northland. Further, Plaintiff's diminished creditworthiness, resulting from Northland's inaccurate reporting, has caused her to abandon her intentions to apply for certain credit.

107.    Northland's actions, as alleged herein, are in direct violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b).

**FIRST CAUSE OF ACTION**

**(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681s-2(b))**

**(Against Defendant)**

108.    Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.    Northland Failed to Reinvestigate Following Plaintiff's Disputes**

109.    Pursuant to 15 U.S.C. § 1681s-2(b), data furnishers are prohibited from providing any information relating to a consumer to any CRA if it knows, or has reasonable cause to believe,

that the information is inaccurate or misleading and requires data furnishers to update and/or correct inaccurate information after a CRA notifies it of a consumer dispute.

110. Northland sent an AUD or monthly transmission to TransUnion reporting Plaintiff's account as included in bankruptcy.

111. After Plaintiff and Northland executed the Reaffirmation Agreement and it was filed with the court, Northland continued to report the debt as described herein.

112. After execution of the Reaffirmation Agreement, Northland did not report the debt as "reaffirmed" but instead continued to report it as included and discharged in bankruptcy, without a balance, and with inaccurate and incomplete payment history to TransUnion.

113. After execution of the Reaffirmation Agreement, Plaintiff continued making payments, yet Northland was misreporting those payments to TransUnion.

114. After receiving notice of the Dispute Letters, Northland did not correct the inaccurate or incomplete reporting, but instead verified and re-reported the debt via ACDV to TransUnion.

115. Once the account was reaffirmed, the account should be reported to reflect the current liability on the account, current ongoing payment terms, and actual payment history. Not doing so makes the reporting patently incorrect and very likely to mislead a credit reviewer of the consumer's performance and liability on the debt.

116. Northland violated 15 U.S.C. § 1681s-2(b) by either failing to conduct an investigation or failing to conduct a reasonable investigation, and re-reporting misleading and inaccurate account information.

117. TransUnion provided notice to Northland that Plaintiff was disputing the inaccurate and misleading information; however, Northland failed to conduct a reasonable investigation as required by the FCRA.

118. Based on the Plaintiff's disputes and attached documents, along with a review of its own internal records, Northland should have known its account was reaffirmed and payments were being made. Further, Northland should have reported the full payment history as it has actual knowledge of the payments being made from the filing of the reaffirmation agreement until present.

119. Since Northland has already decided to report the account, as evidenced by it showing up on Plaintiff's credit report, once it received notice of the Dispute Letters, it had a duty

to review all relevant information, and update any incorrect or inaccurate information to TransUnion.

120.     Inaccurate information includes not only the information reported, such as reporting a debt as discharged when it was reaffirmed, but also for omissions that render the reported information misleading, such as not reporting payments that were made.

121.     Reporting an account which was reaffirmed with positive payment history as discharged in bankruptcy and with incomplete payment history is patently incorrect.

122.     Discharged debts are much more detrimental to a credit score than a reaffirmed debt, still being paid, and in good standing. In addition, this inaccurate reporting also adversely affects credit decisions. This inaccurately reported account is being considered when calculating Plaintiff's Credit Score. Most lenders, employers, and other individuals who access a consumer's credit report approve or deny credit or employment based upon the reported credit score and do not take the time to look through each tradeline of every account listed to obtain context. Therefore, Northland's reporting as described herein has a direct adverse effect on Plaintiff's Credit Score and her ability to rebuild her Credit Score and obtain new credit.

123.     In the alternative, if Northland only received notice of one dispute letter, it had a statutory duty pursuant to 15 U.S.C. § 1681s-2(b)(1)(D) to update and correct the inaccurate reporting to all credit bureaus, which it failed to do.

124.     As a result of Northland's violations of 15 U.S.C. § 1681s-2(b), Plaintiff has suffered actual damages, including but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit, and other mental and emotional distress.

125.     The lack of investigation by Northland, as required by the FCRA, is unreasonable.

**B.     Willful Violations**

126.     Plaintiff alleges that Northland has reported based upon objectively unreasonable interpretations of the FCRA standards of credit reporting and regulatory guidelines on how to accurately report under the FCRA.

127.     Plaintiff further alleges that Northland has not properly trained those directly investigating disputes on FCRA requirements or credit reporting industry standards and, as such, has developed reckless policies and procedures.

128.    Plaintiff alleges that rather than train its employees on accurate credit reporting, FCRA requirements, and industry standards, Northland's employees tasked with reviewing disputes are expected to confirm the information being reported as "accurate" instead of investigating the reported information.

129.    Regulation V imposes on furnishers, in part, a requirement that reporting be accurate. Accuracy's definition includes correctly reflecting the account's terms and liability and reflecting the consumer's performance on the account. The reporting in this case is clearly not accurate.

130.    "A willful [FCRA] violation is one committed with actual knowledge or recklessness." *Persinger v. Sw. Credit Sys., L.P.*, 20 F.4th 1184, 1197 (7th Cir. 2021). A violation is reckless if there is "an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Safeco Ins. Co. of Am. V. Burr*, 551 U.S. 47, 68 (2007).

131.    As Plaintiff executed the Reaffirmation Agreement, she retained personal liability on the loan, and it was not discharged in her bankruptcy. Northland had actual knowledge of the bankruptcy, the Reaffirmation Agreement (which it executed and filed with the bankruptcy court), along with Plaintiff's intent to retain her vehicle, and continue to pay her debt. Northland accepted Plaintiff's payments each month and has continued to do so through present. All this evidence, taken together, which directly contradicts the reporting of the account, establishes Northland's willfulness under relevant case law and regulations.

132.    Further, given the knowledge Northland had, Northland knew that its inaccurate reporting, as described herein, ran an unjustifiable high risk of harm which was known and obvious.

133.    Therefore, Northland's actions were willful violations of the FCRA, which entitles Plaintiff to recover under 15 U.S.C. § 1681n.

134.    In the alternative, Northland was negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

135.    Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from Northland in an amount to be determined by this Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## PRAYER FOR RELIEF

136.    WHEREFORE, Plaintiff prays for judgment as follows:

a.    For preliminary and permanent injunctive relief to stop Defendant from engaging in the conduct described above;

b.    Award statutory and actual damages pursuant to 15 U.S.C. § 1681n;

c.    Award punitive damages in order to deter further unlawful conduct pursuant to 15 U.S.C. § 1681n;

d.    Award attorneys' fees and costs of suit incurred herein pursuant to 15 U.S.C. §§ 1681n and 1681o;

e.    For determination by the Court that Defendant's policies and practices are unlawful and in willful violation of 15 U.S.C. § 1681n, *et seq*.; and

f.    For determination by the Court that Defendant's policies and practices are unlawful and in negligent violation of 15 U.S.C. § 1681o.

## DEMAND FOR JURY TRIAL

137.    Plaintiff hereby demands trial of this matter by jury.

Respectfully submitted,

**SCHUMACHER LANE PLLC**

Dated: August 30, 2025

*/s/ Joshua B. Lane*
Joshua B. Lane
TX Bar No. 24092665
P.O. Box 558
Spring Branch, TX 78070
Phone: (210) 541-2154
Fax: (210) 783-1383
josh@schumacherlane.com